CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

OCT 29 2015

JULIA C. DUDLEY, CLERK
BY: /s/
 DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JUNIOR SPRADLIN, ) | Civil Action No. 7:15-cv-00028 | |
|    Petitioner, ) | | |
| ) | | |
| v. ) | **MEMORANDUM OPINION** | |
| ) | | |
| WARDEN, ) | By: | Hon. Jackson L. Kiser |
|    Respondent. ) | | Senior United States District Judge |

Junior Spradlin, a Virginia inmate proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his judgment entered by the Circuit Court of Washington County. Respondent filed a motion to dismiss, and Petitioner responded, making the matter ripe for disposition. After reviewing the record, I grant Respondent's motion and dismiss the petition.

## I.

Petitioner is detained pursuant to a final judgment of the Circuit Court for Washington County after being convicted of second-degree murder and sentenced to forty years' imprisonment. Petitioner appealed his conviction to the Court of Appeals of Virginia, which denied the appeal, and to the Supreme Court of Virginia, which refused the appeal. The Supreme Court of Virginia also dismissed Petitioner's subsequent petition for a writ of habeas corpus that presented four main claims, including ineffective assistance of counsel and sufficiency of the evidence.

Petitioner timely filed the instant federal habeas petition that presents the following claims:

1. "Never got to tell my side of the story. No way to k[no]w I could kill him with one punch. No evidence to say my punch killed him. The fall is what killed him. Only thing that left marks on him";

2. "Doctors said he had a prior condition . . . in [his] brain stem and he was drunk [with a] .236 blood alcohol content";

3. "Was tackled by his brother, [which] is what killed him[.] [W]hen we all fell on [a] drain basin that is what put all the bruises and cuts on him"; and

4. "[Five] local doctors examined him [and] said he had an aneurysm. They found no marks from punch."

Respondent filed a motion to dismiss, arguing that the claims are meritless, unexhausted, and procedurally defaulted. For the following reasons, I concur with Respondent and dismiss the petition.

## II.

A federal court "may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court." Baker v. Corcoran, 220 F.3d 276, 288 (4th Cir. 2000); see 28 U.S.C. § 2254(b) (mandating exhaustion). The purpose of exhaustion is to give "state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." O'Sullivan v. Boerckel, 526 U.S. 838, 846 (1999). The exhaustion requirement is satisfied by finding that the "essential legal theories and factual allegations advanced in federal court . . . [are] the same as those advanced at least once to the highest state court." Pruett v. Thompson, 771 F. Supp. 1428, 1436 (E.D. Va. 1991), aff'd, 996 F.2d 1560 (4th Cir. 1993) (citing Picard v. Connor, 404 U.S. 270, 275-76 (1971)). Therefore, petitioner must present both

the same argument and factual support to the state court prior to filing the claim with a federal court. Anderson v. Harless, 459 U. S. 4, 6-7 (1982).

The specific theories raised in the second, third, and fourth claims and part of the first claim other than about the punch were never presented to any state court. These claims would be procedurally barred from review in state court if Petitioner attempted to present them now, pursuant to Virginia Code § 8.01-654(B)(2). Thus, these claims are simultaneously exhausted and defaulted for the purposes of federal habeas review. See Gray v. Netherland, 518 U.S. 152, 160 (1996) (holding claims are treated as exhausted if they were not presented in state court but would nonetheless be procedurally barred under state law). Petitioner does not describe cause and prejudice or a fundamental miscarriage of justice to excuse the procedural default, and none appears in the record. See, e.g., Coleman v. Thompson, 501 U.S. 722, 750 (1991) (permitting a federal court to review a procedurally defaulted claim if the petitioner establishes cause and prejudice or a fundamental miscarriage of justice). Accordingly, parts of the first claim except about a mortal punch and the remaining claims are dismissed as procedurally defaulted.

### III.

Petitioner exhausted part of his first claim that the evidence was insufficient to convict him of second-degree murder because he did not intend to kill the victim with a punch. A federal court may grant habeas relief from a state court judgment "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."[1] 28 U.S.C. § 2254(a). After a state court addresses the merits of a claim also raised in a federal habeas petition, a federal court may not grant the petition unless the state court's adjudication of

---

[1] The due process clause of the Fourteenth Amendment protects a state court defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).

3

a claim is contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts.[2] 28 U.S.C. § 2254(d). "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. ___, 131 S. Ct. 1388, 1398 (2011).

The Court of Appeals of Virginia held that there was "ample evidence" to support the jury's verdict that Petitioner acted with the requisite malice to support the second-degree murder conviction. The Supreme Court of Virginia upheld that determination. See, e.g., Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

I find that the adjudication by the Court of Appeals of Virginia was not contrary to, or an unreasonable application of, clearly established federal law or based on an unreasonable determination of the facts. A state court conviction will not be disturbed if the federal habeas court determines that "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" after viewing the evidence in the light most favorable to the prosecution. Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (original emphasis). I have reviewed the trial record, which the Court of Appeals of Virginia aptly summarized as follows:

---

[2] The evaluation of whether a state court decision is "contrary to" or "an unreasonable application of" federal law is based on an independent review of each standard. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court determination is "contrary to" federal law if it "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law or if the state court decides a case differently than [the United States Supreme] Court has on a set of materially indistinguishable facts." Id. at 413.
 A federal court may issue the writ under the "unreasonable application" clause if the federal court finds that the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. This reasonableness standard is an objective one. Id. at 410. A Virginia court's findings cannot be deemed unreasonable merely because it does not cite established United States Supreme Court precedent on an issue if the result reached is not contrary to that established precedent. Mitchell v. Esparza, 540 U.S. 12, 16 (2003).
 A federal court reviewing a habeas petition "presume[s] the [state] court's factual findings to be sound unless [petitioner] rebuts 'the presumption of correctness by clear and convincing evidence.'" Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(e)(1)). Finally, "[a] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 301 (2010).

4

[I]n early January 2011, [Petitioner] was living at Patsy Prater's house. [Petitioner] was Prater's former boyfriend and he hoped to rekindle their relationship. On January 14, 2011, [Petitioner] packed his clothes with the intention of leaving Prater's house and returning to his house.

On January 15, 2011, [Petitioner] and Prater went to the Moose Lodge to watch a televised football game. Earlier in the day, Prater's friend, Linda Bellamy, arranged for her boyfriend, Donald Roberts, and Donald's twin brother, Ronald Roberts, to meet at the Moose Lodge. While watching the game, Ronald touched Prater's elbow as he commented on a play, and [Petitioner] told Prater, "If he touches you again, I'll beat his head in." During the evening, [Petitioner] told Prater, who had expected to drive [Petitioner] home, that Ronald seemed to like her and that she would leave with Ronald. A short time later, Prater, Bellamy, Ronald, and Donald left the Moose Lodge and drove to Prater's house. After Prater and the others left the Moose Lodge, [Petitioner] borrowed a cell phone from Davis Ennis to make some calls. [Petitioner] asked Davis to drive him to Prater's to pick up his belongings.

While driving home, Prater's cell phone rang, but she did not recognize the number and she let the call go to voicemail. Prater listened to the voicemail a short time later, and she heard ... [Petitioner] saying, "Fuck you." Prater received another phone call from [Petitioner] approximately ten minutes later, and she again let the call go to voicemail. In the second message, [Petitioner] said, "Have fun, bitch. I'm going to beat his head in when I see him." Upon arriving at her house, Prater gathered her belongings, secured her house, and placed [Petitioner]'s clothes, which he had packed the night before, on the front porch. [Petitioner] arrived at Prater's and spoke to her. When [Petitioner] asked Prater if she was "okay with this," Prater replied that she was and told [Petitioner] to take his clothes and leave. [Petitioner] agreed it was time to leave, and he threw his clothes into Ennis's car. Standing in the driveway, [Petitioner] yelled, "Do you want me to? Do you want me to? You want me to sucker punch him?" [Petitioner] walked back to where Prater, Bellamy, Donald, and Ronald were standing. [Petitioner] had "some words" with the group. [Petitioner] punched Ronald, who had his hands in his pocket, in the head, knocking Ronald to the ground. According to Ennis, Ronald was ten to fifteen feet from the point of impact to where he hit the ground. Donald struggled with [Petitioner], but [Petitioner] broke free, ran to Ennis's car, and left the area. Ennis and Prater described [Petitioner]'s behavior prior to punching Ronald as "calm."

Bellamy, a nurse, realized Ronald was injured and began performing CPR while Prater called 911. When the first responders arrived, they detected a few shallow breaths and a slow heart rate, but by the time Ronald was placed on a

Case 7:15-cv-00028-JLK-RSB Document 18 Filed 10/29/15 Page 5 of 7 Pageid#: 469

backboard, the respirations and heartbeat had stopped. There was no blood or visible injury to Ronald. The local hospital was less than one mile from the scene, and when Ronald arrived at the emergency room, Dr. Carcy Straener did not see any bruises, bleeding, or obvious signs of injuries. Dr. Straener continued resuscitation, ordered tests, and diagnosed a subarachnoid hemorrhage. He transferred Ronald to a nearby medical center. On January 16, 2011, Dr. Girende Hoskere, a critical care physician at the medical center, evaluated Ronald's brain activity, which showed no reflexes, no spontaneous respiration, no blood flow to the brain, and which registered the lowest score on the Glasgow coma scale. A CT scan showed a large amount of subarachnoid hemorrhage with ventricular hemorrhage. Ronald was pronounced dead shortly thereafter. Tests showed that Ronald was intoxicated at the time of the incident.

On January 18, 2011, Dr. Amy Tharp, an assistant medical examiner, performed an autopsy of Ronald's body. Dr. Tharp concluded that Ronald died as a result of acute post-traumatic subarachnoid hemorrhage. Because Ronald had sustained a blow to his head, Dr. Tharp ruled out the most common natural causes of death, including cerebral aneurysm, brain tumor rupture, and hypertensive bleeding. Dr. Tharp also ruled out the possibility that the bleed-inducing trauma was caused by the impact with the ground where Ronald fell after [Petitioner] punched him. After she completed her examination, Dr. Tharp sent Ronald's brain to the medical examiner's office in Manassas, Virginia, for further examination by Dr. Bennett Omalu, an expert in neuropathology and forensic pathology. Dr. Omalu agreed that the bleeding in Ronald's brain was not caused by an aneurysm or other natural cause. Dr. Omalu also agreed that the tears in the small vessels at the base of Ronald's brain evinced the type of injury likely to occur when a person suffered a sudden "whiplash" movement, such as a blow to the head. According to Drs. Tharp and Omalu, after [Petitioner] punched Ronald, Ronald exhibited textbook signs of a subarachnoid hemorrhage.

In a statement to the police, [Petitioner] said that Ronald sucker punched him first and claimed he hit Ronald in self-defense.

Dr. Travis Burt, a neurosurgeon at the medical center and a defense witness, testified he reviewed the CT scan performed at the hospital and stated that the scan was consistent with an aneurysmal rupture. Dr. Burt conceded, however, that the best evidence of the injury would be a direct examination of the brain during the autopsy.

6

Spradlin v. Commonwealth of Virginia, No. 0957-12-3, slip op. at 2-4 (Va. Ct. App. Dec. 6, 2012); see Trial Tr. 9-10, 12, 14, 22-26, 31, 34, 36-41, 47-51, 60-65, 67, 71-77, 83, 84, 95-103, 108, 110-12, 119-20, 122-24, 126.

After reviewing the trial transcript and evidence in the light most favorable to the Commonwealth, I find that any rational trier of fact could have found beyond a reasonable doubt that Petitioner committed second-degree murder.[3] See Dawkins v. Commonwealth, 186 Va. 55, 61, 41 S.E.2d 500, 503 (1947) (stating whether defendant acted maliciously is a question of fact). The Commonwealth's evidence established that Petitioner talked about how he would sucker punch and "beat in" the victim's head and did, in fact, sucker punch the victim with a fatal blow to the head. Accordingly, I dismiss this claim.

## IV.

For the foregoing reasons, I grant Respondent's motion to dismiss and dismiss the habeas petition. Based upon my finding that Petitioner has not made the requisite substantial showing of a denial of a constitutional right as required by 28 U.S.C. § 2253(c), a certificate of appealability is denied.

ENTER: This 29th day of October, 2015.

*Jackson L. Kiser*
Senior United States District Judge

---

[3] "Second degree murder is defined as a 'malicious killing' of another person." Lynn v. Commonwealth, 27 Va. App. 336, 351, 499 S.E.2d 1, 8 (1998) (citation omitted), aff'd, 257 Va. 239, 514 S.E.2d 147 (1999); see Va. Code § 18.2-32. "Whether or not an accused acted with malice is generally a question of fact and may be proved by circumstantial evidence." Canipe v. Commonwealth, 25 Va. App. 629, 642, 491 S.E.2d 747, 753 (1997). The Supreme of Virginia recognizes that "malice is implied by law from any willful, deliberate and cruel act against another, however sudden." Epperly v. Commonwealth, 224 Va. 214, 231, 294 S.E.2d 882, 892 (1982); see Fletcher v. Commonwealth, 209 Va. 636, 640, 166 S.E. 2d 269, 272 (1969) (noting that malice may be inferred from "the intentional doing of a wrongful act without legal justification or excuse").

7